# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| THE NATIONAL FEDERATION OF ) <br> THE BLIND OF ALABAMA, et al., ) <br> ) <br> *Plaintiffs,* ) <br> ) <br> vs. ) <br> ) <br> JOHN H. MERRILL, *in his official* ) <br> *capacity as Secretary of State of Alabama,* ) <br> ) <br> *Defendant.* ) <br> ) | Case No. 2:22-cv-00721-CLM |

## **REPLY IN SUPPORT OF MOTION TO DISMISS**

Steve Marshall
 *Attorney General*
James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
 *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 242-7300
Fax: (334) 353-8400
Jim.Davis@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

Plaintiffs' suit fails at the outset because they lack standing to sue Secretary Merrill. They cannot trace their alleged injury to Secretary Merrill and, without relief against local election officials, no order against Secretary Merrill could grant Plaintiffs the relief they seek. Even if the Court had jurisdiction, Plaintiffs' claims fail as a matter of law and are due to be dismissed at the pleadings stage for three reasons. First, the Americans with Disabilities Act cannot operate to preempt State election law in this context because it does not do so *specifically*. Second, Plaintiffs seek to abrogate Alabama's essential eligibility requirements for voting and, in the process, fundamentally change Alabama elections by creating the ability for domestic voters to vote remotely via the internet. And third, Plaintiffs are not "excluded" from voting when the State accommodates blind voters in several ways: accessible electronic voting machines, voting with third-party assistance of their choosing, and the ability to vote absentee even though most Alabamians cannot do so. Plaintiffs prefer a different accommodation, but federal law does not require it and State law does not allow it. Plaintiffs' Complaint is therefore due to be dismissed.

**I.       Plaintiffs fail to show that they have standing to sue Secretary Merrill.**

"A plaintiff seeking to invoke a federal court's jurisdiction bears the burden of establishing standing." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1304 (11th Cir. 2004) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Though Plaintiffs spend pages attempting to rebut Secretary Merrill's argument that they have failed to demonstrate standing, their argument boils down to unsupported assertions and misstatements of State law. Because Plaintiffs have failed to show that a Court order against Secretary Merrill—as opposed to local election officials not under his control—would affect their access to overseas absentee voting, "any injury [Plaintiffs] might suffer is neither fairly traceable to the Secretary nor redressable by a judgment against [him] because [he] does not enforce the challenged law." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1241 (11th Cir. 2020). Thus, this Court lacks jurisdiction to enjoin Secretary Merrill.

Secretary Merrill does not "control[ access to] the electronic absentee ballot system[.]" Doc. 18 at 12.[1] Instead, local election officials—Absentee Election Managers ("AEMs")—do. *See* Ala. Code § 17-11-42(a). Indeed, State law specifically prohibits AEMs from letting individuals who are not overseas vote by electronic transmission. *See id.*; *see also* Ala. Admin. Code r. -06(2)(b)(3). Similarly, State law restricts how AEMs can transmit absentee ballots to domestic absentee voters, providing that ballots "shall" be provided either in person or by U.S. mail. Ala. Code § 17-11-5(a). Even if this Court were to enjoin Secretary Merrill, AEMs—not bound by an order against the Secretary—must comply with State law. And there is nothing "to suggest that the [AEMs] would suddenly begin to disregard state law," *Jacobson*, 974 F.3d at 1257, which would still prohibit AEMs from carrying out the relief Plaintiffs demand. Plaintiffs therefore cannot establish standing against Secretary Merrill.

Plaintiffs cite a litany of statutes that they say support their argument, but none establishes that Secretary Merrill could override the AEMs' role in the absentee voting process. Start with Plaintiffs' citations to Ala. Code §§ 17-4-35(14) and 17-11-4. The former tasks the Supervisor of Voter Registration (an employee in the Secretary's Office) with "provid[ing] military and overseas voters with . . . absentee ballot applications and otherwise assist[ing] such voters with information helpful in . . . obtaining absentee ballots." Ala. Code § 17-4-35(14). This provision carries with it no authority at all; it simply gives the "Supervisor" the role of providing information to overseas voters. The latter is a general provision in Chapter 11 (Absentee Voting) of Title 17 (Elections), which states in relevant part that "The Secretary of State shall provide applications for absentee voting to military and overseas voters in accordance with Section 17-4-35." Ala. Code § 17-11-4. This provision also carries with it no enforcement authority or responsibility.

---

[1] Document citations use the pagination in the ECF header of every document.

2

Separately, Alabama law provides for the Alabama Electronic Overseas Voting Advisory Committee "to determine whether secure electronic means may be established for conducting absentee voting for overseas voters and to advise and assist the office of the Secretary of State in the establishment, testing, and implementation of absentee overseas balloting by secure electronic means." Ala. Code § 17-11-41(a). Pursuant to Ala. Code § 17-11-42(a), the Secretary of State "promulgate[s] rules proposed by the committee to provide [electronic overseas voting] to eligible overseas voters." These regulations exist in the Alabama Administrative Code in Rule 820-2-10. But Ala. Code § 17-11-42(a) does not give Secretary Merrill any enforcement authority or responsibility; instead, it *requires* that the AEMs be vested with that authority. Nor can the Secretary even promulgate the regulations without the Committee proposing them.

State law establishes that—as with domestic absentee voting, *see* Doc. 13 at 8-9 (Motion to Dismiss)—AEMs manage access to overseas absentee voting. *See* Ala. Code § 17-11-42(a) ("The rules . . . shall authorize [AEMs] . . . to accept requests for absentee ballots and voted absentee ballots from overseas voters and provide a process for verifying the identity of a voter, ensuring the security of the transmission, accepting a voted ballot, and recording each ballot received."). AEMs receive applications from voters, Ala. Admin. Code r. 820-2-10-.03(1); verify the voter's registration status, *id.* (3)(a); and deliver the ballot to the voter, *id.* (3)(c). Most importantly, "[t]he absentee election manager *shall determine the eligibility of the absentee voter to return the absentee ballot by electronic transmission* by evaluating the absentee ballot application of said voter. *Id.* r. 820-2-10-.06(2)(a)(3)(b) (emphasis added). If information establishes that a voter is not residing overseas, "the absentee election manager shall not permit the voter to return the ballot by electronic transmission." *Id.* (2)(a)(3)(b)(3).

3

The Secretary's role in the process is limited. He prescribes a standardized absentee ballot application, Ala. Code § 17-11-5(d); transmits the blank absentee ballot, Ala. Admin. Code r. 820-2-10-.03(3)(a); and covers associated expenses, Ala. Code § 17-11-51. Creating the application, pressing send, and paying vendors do not empower Secretary Merrill to expand access to electronic absentee voting in Alabama.[2] Secretary Merrill has no legal power to "permit access to the system by voters with print disabilities," and Plaintiffs offer no authority to the contrary. Moreover, Ala. Code § 17-11-5 expressly limits an AEM to providing domestic absentee voters with absentee ballots only by mail or in person—not electronically. No injunctive relief that this Court could grant against Secretary Merrill would impact AEMs' duty to reject non-overseas voters who attempt to return their ballots electronically.[3]

Nor does Secretary Merrill's rulemaking authority establish standing. The remaining statutes that Plaintiffs cite in support of the mistaken belief that Secretary Merrill controls access to overseas absentee voting, electronic or otherwise, all involve his authority to promulgate rules and determine generalized procedures. *See* Doc. 18 at 13 (citing Ala. Code §§ 17-11-5(d); 17-11-

---

[2] The same is true regarding Secretary Merrill's involvement in domestic absentee voting. That he designs the absentee election application, Ala. Code § 17-11-4 (cited by Doc. 18 at 14); designs and provides a "special form" to AEMs for attendant physicians to describe medical emergencies, *id.* § 17-11-3 (cited by Doc. 18 at 14); and receives—along with the county or municipality—"an itemized and signed statement showing a description and the quantity of each item so shipped or delivered," *id.* § 17-11-19 (cited by Doc. 18 at 14), do not establish traceability or redressability. On the other hand, AEMs receive absentee ballot applications, *id.* § 17-11-3.1; determine if the applicant is "on the list of qualified voters," *id.* § 17-11-5(a); receive absentee ballots, *id.* § 17-11-9; "determine whether an applicant . . . is obligated to produce identification, *id.*; and deliver the ballots to election officials, *id.* § 17-11-10. Thus, as argued in Secretary Merrill's Motion to Dismiss, AEMs "manage the absentee balloting process." Doc. 13 at 8-9.

[3] Plaintiffs make much of Secretary Merrill's assertion that "[t]he United States has sued Alabama multiple times to enforce [UOCAVA]," claiming that what is "[n]otably absent" is "an explanation for why he is the proper defendant in th[o]se cases but not here." Doc. 18 at 13 (citation omitted). The explanation is that "[t]he United States . . . sued *Alabama*." Doc. 13 at 18 n.7 (emphasis added). That the State of Alabama was a proper party obviated any reason to dispute the Secretary of State's party status.

4

42; 17-11-43.1; 17-11-45; 17-11-48). *Jacobson* squarely rejects that theory of standing. 974 F.3d at 1257 ("That the Secretary has the power to prescribe rules and issue directives about ballot order, which the Supervisors might well be obliged to follow, says nothing about whether she 'possess[es] authority to *enforce* the complained-of provision,' as the causation element of standing requires." (citing *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (en banc))).[4] Plaintiffs are making precisely that rejected argument: "once Defendant permits [county officials] to [allow voters with print disabilities to access the system], they can be expected to comply with those obligations." Doc. 18 at 11. But "[i]f rulemaking authority were sufficient to establish traceability, plaintiffs could presumably also challenge a law by suing the legislators who enacted it instead of the officials who execute it." *Jacobson*, 974 F.3d at 1257. Because Plaintiffs cite nothing other than Secretary Merrill's role in *promulgating* regulations, they have not established standing in this case.[5]

Plaintiffs' appeals to Secretary Merrill's authority in other areas, *see* Doc. 18 at 14-16, also fails to establish traceability and redressability. His position as the "chief elections official in the state," Doc. 18 at 14 (quoting Ala. Code § 17-1-3), cannot be relied upon to establish traceability, *Jacobson*, 974 F.3d at 1254 (discussing *Lewis*, 944 F.3d at 1300). Nor does Secretary Merrill's role in *other* parts of election administration, *see* Doc. 18 at 14 n.1, 15, affect whether he is the

---

[4] Plaintiffs' efforts to distinguish *Jacobson* fail. Secretary Merrill does not argue that *Jacobson* created a bright-line rule that county election officials are *always* the proper defendants in an election-law case. He merely asks this Court to apply what *Jacobson* says: courts can "enjoin executive officials from taking steps to enforce a statute . . . only when the officials who enforce the challenged statute are properly made parties to a suit." 974 F.3d at 1255 (citation omitted). Under Alabama law, Secretary Merrill does not enforce requirements related to absentee voting, whether overseas or domestic. Thus, Plaintiffs' attempt to distinguish *Jacobson* fails.

[5] The same argument would apply to Plaintiffs' citations to statutes granting Secretary Merrill rulemaking authority relating to domestic absentee voting. *See* Doc. 18 at 13-14 (citing Ala. Code §§ 17-11-3, -4).

proper party in *this* lawsuit. Instead, it demonstrates that the Legislature knew how to task Secretary Merrill with statutory responsibilities in other areas, which underscores his lack of responsibility over absentee voting. Lastly, Plaintiffs argue that "the Secretary" is responsible for implementing a host of regulations implementing the ADA, *id.* at 14-15, but they cite no authority to suggest that "the Secretary" is the official responsible for enforcement of the cited regulations at all. *See Lightbourn v. County of El Paso*, 118 F.3d 421, 432 (5th Cir. 1997) (holding that the Texas Secretary of State "has no duty under . . . the ADA to take steps to ensure that local election officials comply with the ADA."). That certain ADA regulations apply to all public entities does not establish that *Secretary Merrill* is the party who enforces those regulations. Because Plaintiffs cannot establish traceability or redressability as to Secretary Merrill, dismissal is warranted.

**II.     The ADA does not preempt State election laws because it does not do so specifically.**

Plaintiffs concede that, outside of Elections Clause legislation, a clear-statement rule applies in this context. Doc. 18 at 18. The ADA[6] does not preempt State election laws unless that result is the "clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "It has long been settled . . . that we presume federal statutes do not . . . preempt state law." *Bond v. United States*, 572 U.S. 844, 858 (2014). This is especially true where the federal law would "override[] the 'usual constitutional balance of federal and state powers.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991)). To preempt State law in this context, Congress "[must be] reasonably explicit about it." *Id.* (alteration in original) (citation omitted).

Plaintiffs say that Congress demonstrated its manifest intent to preempt State election laws by including a single legislative finding elsewhere in the ADA: "discrimination against individuals

---

[6] Plaintiff makes no argument at all that the Rehab Act shows Congress's manifest intent to preempt State law.

6

with disabilities persists in such critical areas as . . . voting, and access to public services." Doc. 18 at 18 (quoting 42 U.S.C. § 12101(a)(3)). That's it. At most, this passing reference to voting indicates that Congress understood that the ADA affected voting.[7] But that alone does not indicate that Congress intended the ADA to *preempt* State election law. It bears repeating—and Plaintiffs do not contest—that "the ADA does not include even a single provision specifically governing elections." *Lightbourn*, 118 F.3d at 430. Instead, the ADA provision at issue in this case provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. In stark contrast to election-related laws Congress has enacted (more on that below), the ADA does not show any attempt to preempt States' broad authority over the conduct of elections. It certainly doesn't show that preemption was Congress's clear and manifest purpose.

Courts must not read a statute's seemingly broad text in a way that intrudes on matters traditionally regulated by the States. *Bond*, 572 U.S. at 857-58.[8] In *Bond*, the Supreme Court considered whether a federal criminal law criminalizing the use of "toxic chemicals" for a non-"peaceful purpose" applied to a woman's use of a toxic chemical to harm her husband's lover. *Id.*

---

[7] The ADA can improve access to voting without coming into conflict with State election law. For example, the ADA might require making a polling place more accessible, which could reduce discrimination against individuals with disabilities to the extent an individual votes at that courthouse. *See generally Tennessee v. Lane*, 541 U.S. 509 (2004).

[8] Plaintiffs complain that the cases on which Secretary Merrill relies—including *United States v. Gradwell*, 243 U.S. 476 (1917)—are not technically cases about federal preemption of State laws. Doc. 18 at 9-10. In *Bond*, the Supreme Court explained that several doctrines—including the presumption that federal law does not preempt state law—are "grounded in the relationship between the Federal Government and the States under our Constitution." 572 U.S. at 857-58. "Closely related to these [doctrines] is the well-established principle that 'it is incumbent upon the federal courts to be certain of Congress's intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'" *Id.* at 858 (quoting *Gregory*, 501 U.S. at 460).

at 856-57. The Court explained that, notwithstanding the law's seemingly broad scope, courts must "refer to basic principles of federalism embodied in the Constitution to resolve ambiguity in a federal statute." *Id.* at 859. Importantly, though the text seemingly applied to the alleged crime involved, "the ambiguity derive[d] from the improbably broad reach of the key statutory definition given the term" at issue. *Id.* at 860. In those circumstances, the Court "insist[ed] on a clear indication that Congress meant to reach purely local crimes[] before interpreting the statute's expansive language in a way that intrudes on the police power of the States." *Id.*

The Court's analysis in *Bond* is instructive here. Like the criminal law at issue in *Bond*, the ADA includes terms with language so broad that courts understand it to include *everything* a government entity does. *See Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1085 (11th Cir. 2007). The Supreme Court in *Bond* held that a similarly broad provision "d[id] not constitute a clear statement that Congress meant the statute" to regulate an area traditionally regulated by the States. *Bond*, 572 U.S. at 860. So too this Court should hold: The broad terms of the ADA do not target the conduct of elections as to override State election laws.

Plaintiffs wrongly state that Secretary Merrill argues "that Congress can *only* preempt state election law when it does so via the Elections Clause." Doc. 18 at 18. Rather, Secretary Merrill's position is that Congress can only preempt State election law when it does so clearly in legislation *targeting elections*. Such targeting is common and does not always come in the form of Elections Clause legislation. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301 (1966) (holding that Congress lawfully enacted portion of the Voting Rights Act under the Fifteenth Amendment). In fact, multiple federal laws targeting elections already provide requirements for accommodating disabled voters in elections, including blind voters. *E.g.*, 52 U.S.C. § 10508 (Voting Rights Act) ("Voting assistance for blind, disabled or illiterate persons"). Another example is the Voting

8

Accessibility for the Elderly and Handicapped Act, which generally requires "[a]ccessibility to all polling places" unless, in some circumstances, a "handicapped or elderly voter" is "provided with an alternative means for casting a ballot on the day of the election." 52 U.S.C. § 20102. Unlike the ADA, these laws make perfectly clear that they displace any contrary State election law.

Plaintiffs weakly distinguish *Gregory v. Ashcroft* on the ground that it involved an exception from federal law, Doc. 18 at 19, but that distinction has nothing to do with *Gregory*'s application. Relevant here, the point of *Gregory* is that the Supreme Court "w[ould] not read the ADEA to cover state judges unless Congress has made it clear that judges are *included*." 501 U.S. at 467 (emphasis in original). Just as Congress did not make clear that the ADEA's preemptive scope covered judicial qualifications, Congress did not make clear that the ADA's preemptive scope covered State election procedures. That the ADEA's text was seemingly broad did not indicate that it preempted an area traditionally regulated by the States. Just the opposite: the language was "sufficiently broad that" the Supreme Court could not "conclude that the statute plainly cover[ed] appointed state judges." *Id.* So too here. The ADA's broad text alone does not indicate that it contains a clear statement of Congress's intent to preempt State election laws.

In a footnote, Plaintiffs mention that the ADA sometimes applies in factual contexts not mentioned in its text. Doc. 18 at 18-11 n.2 (citing *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)). That may be. But it remains that Congress can only preempt State laws if that result is "unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460 (citations omitted). States have the primary responsibility for regulating elections. Therefore, when Congress enacts law targeting elections, "it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013) (emphasis in original). It is for this reason that the presumption against preemption is more easily

overcome when Congress enacts law targeting elections, and it is undisputed that the ADA is not such a law. In any event, the Supreme Court has explained that generalized language is typically insufficient to show Congress's intent to override State laws in areas like elections that are traditionally regulated by the States. *See Bond*, 572 U.S. at 860.

Congress knows how to address the important issue of discrimination in voting, and it has done so numerous times—including in the Voting Accessibility for the Elderly and Handicapped Act. But there is no indication that Congress displaced State election laws when it passed the ADA. Given the lack of a clear statement indicating that preemption of State election law is required here, this Court should find that the ADA does not preempt Alabama election law in this context and dismiss the Complaint for failure to state a claim.

**III.    Taking Alabama's elections online would alter its essential eligibility requirements for voting and fundamentally alter its elections.**

As an initial matter, binding precedent contradicts Plaintiffs' contentions that courts cannot consider affirmative defenses on a motion to dismiss. *See, e.g.*, *Bingham v. Thomas*, 654 F.3d 1171, 1175 (11th Cir. 2011) ("A complaint may be dismissed if an affirmative defense . . . appears on the face of the complaint."); *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations [of the complaint], for example, show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim; that does not make the statute of limitations any less an affirmative defense.").

At any rate, whether a requirement is essential is not an affirmative defense but rather a necessary component of Plaintiffs' prima facie claim. *See* 42 U.S.C. § 12131(2). Plaintiffs' attempts to shift this burden to Defendants is unavailing, as neither the ADA nor the Rehab Act "require States to compromise their essential eligibility criteria for public programs." *Tennessee v.*

*Lane*, 541 U.S. 509, 531-32 (2004). The ADA does not provide Plaintiffs with the authority to second-guess the State's discretion to choose reasonable essential eligibility requirements.

Moreover, that Plaintiffs request relief that would work a fundamental alteration in Alabama's elections is obvious on the face of the complaint. Unlike Maryland's absentee voting system at issue in *National Federation of the Blind v. Lamone*, which "allows *any* voter to vote by absentee ballot," 813 F.3d 494 (4th Cir. 2016), Alabama's absentee voting system is far more limited. In Alabama, only those voters with a qualifying excuse may vote by absentee ballot, *see* Ala. Code § 17-11-3, and only a limited subset of those voters—those who qualify under the federal UOCAVA statute—may vote by electronic absentee ballot, *id.* § 17-11-42.

If Alabama were forced to allow Plaintiffs—and others like Plaintiffs—to vote by electronic ballot, it would transform Alabama's electronic absentee balloting program from a narrow program available only to overseas voters (as required by UOCAVA) to one required for any domestic voter who can show difficulty in voting without assistance due to *any* disability. This forced expansion threatens to erode the State's interests in maintaining a paper balloting system at all, leaving that system more vulnerable to challenge as an unconstitutional burden on voting if *any* voter feels burdened by voting via paper ballot. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) ("[T]he *Anderson-Burdick* test . . . requires [courts] to weigh the character and magnitude of the asserted . . . injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications required the burden to plaintiffs' rights."). Plaintiffs cannot use the Defendants' narrow compliance with UOCAVA to justify expansion under the ADA, particularly when that expansion works to "compromise" Alabama's essential eligibility criteria and fundamentally alter its election procedures. Accordingly, Plaintiffs' claims should be dismissed on those grounds.

## IV.     Plaintiffs have not been "excluded" under the ADA.

Plaintiffs are entitled to nothing more than "meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). "Reasonable accommodations in the grantee's program or benefit" can "assure meaningful access." *Id.* "The hallmark of a reasonable accommodation is effectiveness." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015) (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002)). If the accommodation is effective, it "need not be 'perfect' or the one 'most strongly preferred'" by the plaintiff. *Id.* (citation omitted).

Defining the service, program, or activity at issue here as "voting generally" is appropriate. After all, the "participation" Plaintiffs seek is participation in an election. Votes count the same whether cast in-person or absentee, on paper or online, with assistance or without. Plaintiffs ultimately want to *vote*—electronic absentee voting is simply *how* they prefer to access the program. The Court need not define the program more narrowly because this definition does not "effectively den[y] otherwise qualified handicapped individuals the meaningful access to which they are entitled." *Alexander*, 469 U.S. at 301.

Plaintiffs have "meaningful access" because multiple effective, reasonable accommodations exist. And those accommodations establish that Plaintiffs have not been "excluded" from in-person or absentee voting. Plaintiffs' framing of the relevant program as "private, independent *absentee* voting," Doc. 18 at 24, is designed to guarantee that the only acceptable accommodation is the one that they "most strongly prefer," *Dean*, 804 F.3d at 189. Regardless of Plaintiffs' preferred outcome, the Eleventh Circuit in a similar case agreed that defining the relevant program "voting generally" is appropriate. *See Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1107 (11th Cir. 2011) ("As a public program, disabled citizens must be able to participate in the County's *voting program*." (emphasis added)).

12

Another consideration that counsels against defining the relevant "program" so narrowly is that absentee voting (whether by paper ballot or internet) is not widely available in Alabama. State law does not permit all Alabamians to vote absentee by mail. It is itself an accommodation for select groups, *see* Ala. Code §§ 17-11-3, -3.1—including Plaintiffs, *see* Doc. 1 ¶¶ 11, 18, 25—not an independent program. *Cf. McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807-08 (1969) (rejecting pretrial detainees' claim that denying them absentee ballot violated the Equal Protection Clause because "the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise"); *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 209 (2008) (Scalia, J., concurring in the judgment) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative that falls short of what is required.").

Receiving an absentee ballot electronically is a limited—and federally required—extension of absentee voting. It is only available to "individuals eligible to vote by absentee ballot pursuant to" UOCAVA. Ala. Admin. Code r. 820-2-10-.02. And electronic return is a second-level extension for an even more limited group of UOCAVA voters: generally those who are "temporarily residing outside of the territorial limits of the United States." *Id.* § 820-2-10-.06(2)(a). Thus, electronic absentee voting (with electronic ballot delivery and return, which is what Plaintiffs demand, Doc. 1 at 19), is not a widely available program and thus should not be the "program" under consideration here.

It is for this reason that Plaintiffs' reliance on *Lamone* is especially unpersuasive. *See* 813 F.3d 494. Plaintiffs heavily rely on *Lamone* to justify narrowing the scope of the relevant program to electronic absentee voting. But *Lamone* expressly relied on the "significant" fact that "Maryland

13

allows *any* voter to vote by absentee ballot." 813 F.3d at 504 (emphasis in original) (citation omitted). The court noted that "[a]bsentee ballots are not provided only to a limited set of voters with a demonstrated need to vote absentee; they are instead provided to the entire Maryland electorate at the option of each individual voter." *Id.* That distinction allowed the *Lamone* court to conclude that "it [wa]s far more natural to view absentee voting—rather than the entire voting program—as the appropriate object of scrutiny." *Id. Lamone* is unpersuasive because Alabama *does* only provide absentee ballots "to a limited subset of voters with a demonstrated need," *id.* Ala. Code § 17-11-3. Electronic absentee voting is not widely available, so it is not the appropriate vehicle to analyze Plaintiffs' ADA and Rehab Act claims. *C.f. Hernandez v. N.Y. St. Bd. of Elections*, 479 F. Supp. 3d 1, 12 (S.D.N.Y. 2020) ("The Fourth Circuit has held, and this Court agrees, that where, as here, a challenge is lodged to the accessibility of a widely-available absentee voting program, the 'relevant public service or program at issue' is not the 'voting program in its entirety' but rather the 'absentee voting program.'" (citations omitted)).

Again, multiple effective accommodations exist that prevent Plaintiffs from being "excluded" from voting. For in-person voting, Plaintiffs have two options. First, they can "receive assistance from any person the voter chooses" (with limited exceptions). Ala. Code § 17-9-13. And second, they can vote using handicap-accessible voting machines, which must "include[] nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation, including privacy and independence." Ala. Code § 17-2-2-4 (implementing the Help America Vote Act); *see also Assistance for Voters with Disabilities*, ALA. SEC'Y OF STATE, https://www.sos.alabama.gov/alabama-votes/voter/assistance-disability (last visited Aug. 23, 2022) ("Handicap-accessible voting machines are offered at every polling site in

the State of Alabama[.]").[9] Indeed, Plaintiff Rossiter "was able to vote privately and independently using an accessible voting machine" in the 2020 General Election. Doc. 1 ¶ 22.

The same is true for absentee voting, which Plaintiffs' access to is itself an accommodation. Alabama law allows any person that "has any physical illness or infirmity which prevents his or her attendance at the polls" to vote absentee. Ala. Code § 17-11-3. The Alabama Legislature also recently passed Ala. Act No. 2019-359, which is codified at Ala. Code § 17-11-3.1. The statute—notwithstanding any other restrictions on absentee ballot eligibility—allows any "qualified voter who has a permanent disability preventing his or her attendance at the polls" to automatically receive an absentee ballot by mail. Ala. Code § 17-11-3.1(a). And as with in-person voting, Plaintiffs can receive assistance in filling out their absentee ballot. Ala. Code § 17-9-13(a). The Eleventh Circuit has explained that "provid[ing] third-party assistance to disabled voters" "afforded [the plaintiffs] an equal opportunity to participate in an[d] enjoy the benefits of voting." *Harris*, 647 F.3d at 1108 (cleaned up). That Plaintiffs prefer other accommodations does not render the State's current accommodations ineffective.

Plaintiffs cannot render these accommodations irrelevant by defining the program so narrowly. "[W]hen viewed in its entirety," the State's voting program "is readily accessible to and usable by individuals with disabilities." 28 C.F.R. 35.150(a). Plaintiffs have not been excluded from voting; their complaint's references to the effective, reasonable accommodations that they can take (and have taken) advantage of confirms it. *See* Doc. 13 at 20-21 (citing Doc. 1).

---

[9] "It is established law that a court may take judicial notice of government websites." *Lamonte v. City of Hampton*, 576 F. Supp. 3d 1314, 1327 (N.D. Ga. 2021). And courts can properly take judicial notice of facts without converting a motion to dismiss to a motion for summary judgment. *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010) (citing *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)).

Respectfully submitted,

Steve Marshall
 *Attorney General*

s/Benjamin M. Seiss
James W. Davis (ASB-4063-I58J)
 *Deputy Attorney General*
A. Reid Harris (ASB-1624-D29X)
Brenton M. Smith (ASB-1656-X27Q)
Benjamin M. Seiss (ASB-2110-O00W)
 *Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: 334.35.8674
Facsimile:  334.353.8400
Jim.Davis@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov
Ben.Seiss@AlabamaAG.gov

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 26, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

                        s/Benjamin M. Seiss
                        *Counsel for Secretary Merrill*